IN THE SUPREME COURT OF NORTH CAROLINA

2021-NCSC-45

No. 224A20

Filed 23 April 2021

IN THE MATTER OF: D.A.A.R., S.A.L.R.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from order entered on 6 February 2020 by Judge William B. Davis in District Court, Guilford County. This matter was calendared in the Supreme Court on 19 March 2021 but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Mercedes O. Chut for petitioner-appellee Guilford County Department of Health & Human Services.*
>
> *Wyrick Robbins Yates & Ponton LLP, by Sean S. Planchard, for appellee Guardian ad Litem.*
>
> *Sean P. Vitrano for respondent-appellant mother.*

ERVIN, Justice.

¶ 1 Respondent-mother Amanda R. appeals from the trial court's order terminating her parental rights in D.A.A.R.,[1] a minor child born in May 2013.[2] After

---

[1] "D.A.A.R." will be referred to throughout the remainder of this opinion as "Daniel," which is a pseudonym used to protect his identity and for ease of reading. Daniel's older sister, "S.A.L.R.," was also a subject of the trial court's order and will be referred to using the pseudonym "Sara" throughout the remainder of this opinion for the same reasons.

[2] The challenged trial court order also terminated the parental rights of the father Jesse B. in both children. Although the father noted an appeal to this Court from the trial

careful consideration of respondent-mother's challenges to the trial court's termination order in light of the record and the applicable law, we conclude that the trial court's order should be reversed.

## I. Factual and Procedural Background

On 26 July 2017, the Guilford County Department of Health and Human Services filed juvenile petitions alleging that Daniel and Sara were neglected and dependent juveniles and obtained the entry of orders taking them into nonsecure custody. The process that led to the filing of these juvenile petitions began when DHHS received a child protective services report on 7 April 2017 describing an incident of domestic violence between the parents during which the father held a gun to respondent-mother's head. In the course of the ensuing investigation, DHHS learned of substance abuse by both parents, having been told, among other things, that respondent-mother "was selling her Suboxone medication and buying urine to pass drug screens in order to receive more Suboxone." In addition, the parents failed to attend scheduled meetings with DHHS personnel and vacated their residence without informing DHHS that they intended to do so. On 30 May 2017, the father

---

court's termination order, he subsequently sought leave from this Court to withdraw his appeal, a request that this Court allowed on 15 July 2020.

was charged with the commission of numerous felonies, including robbery with a dangerous weapon and possession of a firearm by a felon.[3]

After leaving Sara in the care of a family friend for what was supposed to be a single night, respondent-mother was "nowhere to be found" when the friend attempted to return Sara to her on the following day. In addition, respondent-mother was reported to be homeless and living in a hotel. However, respondent-mother was ultimately found with Daniel in the home of a former neighbor after DHHS received a report that respondent-mother and the former neighbor had been engaging in substance abuse in Daniel's presence. On 24 July 2017, respondent-mother was arrested and taken into custody by officers of the High Point Police Department at the neighbor's residence. Although respondent-mother agreed to place Daniel with her grandmother pending her release from the Guilford County Detention Center and to participate in a child and family team meeting with DHHS, she failed to attend the child and family team meeting, which had been scheduled for 26 July 2017.

After a hearing held on 16 November 2017 for the purpose of considering the issues raised by the neglect and dependency petitions, Judge Angela C. Foster entered an order on 8 January 2018 finding that Daniel and Sara were neglected and dependent juveniles and continued them in DHHS custody. Judge Foster's order

---

[3] The father was eventually convicted of committing serious criminal offenses and was serving a lengthy prison sentence at the time of the termination hearing.

determined that the barriers to the children's reunification with the parents included their "volatile relationship and history of domestic violence," their untreated "mental health and substance abuse issues," and the lack of stable housing that was suitable for them and the children. Judge Foster noted that, even though respondent-mother had been participating in weekly visitation sessions with the children, she had not attended the adjudication hearing, with her current location being unknown. As a result, Judge Foster ordered respondent-mother to enter into a service agreement with DHHS "and [to] begin complying with the terms and conditions of that agreement, if she desires reunification." Respondent-mother was authorized to have one hour of supervised visitation with the children each week.

¶ 5        Respondent-mother finally entered into a family services agreement with DHHS on 26 January 2018. The family services agreement between DHHS and respondent-mother was intended to address issues relating to substance abuse; domestic violence; emotional and mental health; housing, environmental, and basic physical needs; and parenting skills.

¶ 6        Following a hearing held on 8 February 2018, Judge Foster entered a permanency planning order on 26 March 2018 in which she established a primary permanent plan for the children of reunification with the parents and a secondary plan of adoption. After a hearing held on 8 March 2018, Judge Foster authorized

Daniel and Sara to visit their maternal aunt and uncle in another state[4] pending final approval of the aunt and uncle's residence pursuant to the Interstate Compact on the Placement of Children. The children arrived at their aunt and uncle's residence on 30 March 2018 and were allowed to remain in this out-of-state placement after DHHS presented the approved ICPC home study to Judge Foster on 5 April 2018.

¶ 7    At the next permanency planning hearing, which was held on 3 May 2018, DHHS advised Judge Foster that it had not heard from respondent-mother since the February hearing and that her current location remained a mystery. In light of respondent-mother's failure to make any progress toward satisfying the requirements of her family services plan and the father's apparent lack of interest in the children, Judge Foster entered an order on 2 July 2018 in which she changed the primary permanent plan for the children to one of adoption, with a secondary plan of reunification. In addition, Judge Foster suspended respondent-mother's visitation with the children and directed DHHS to initiate termination of parental rights proceedings against respondents within the next sixty days.

¶ 8    On 4 May 2018, respondent-mother entered a six-month residential substance abuse treatment program in the state in which the children were living with their

---

[4] The trial court granted respondent-mother's request that her current state of residence, which is the same as the state in which the children's maternal aunt and uncle live, not be disclosed to respondent-father. As a result, we will refrain in this opinion from specifying the state to which respondent-mother relocated after leaving North Carolina in May 2018 and in which the maternal aunt and uncle reside.

maternal aunt and uncle. Sara was returned to North Carolina on 25 June 2018 and lived in an emergency shelter on a temporary basis. In a consent order entered on 25 July 2018, Judge Foster allowed respondent-mother to have fifteen minutes of supervised telephone contact with Sara twice each week. On 8 August 2018, Sara was placed with her maternal great aunt and uncle in Rowan County, with Daniel having joined Sara in this placement on 9 August 2018. Throughout this period of time, respondent-mother remained in the residential substance abuse treatment program which she had entered on 4 May 2018.

¶ 9     At the next permanency planning hearing, which was held on 20 September 2018, respondent-mother reported that she was scheduled to complete in-patient substance abuse treatment on 30 October 2018, had been attending weekly parenting classes and individual and group therapy, and intended to take a domestic violence education course. In a permanency planning order entered on 21 November 2018, Judge Foster found that, while respondent-mother had "begun to maintain regular contact with [DHHS,]" she had yet to begin paying child support relating to the children. In light of her progress in substance abuse treatment, respondent-mother asked Judge Foster to stay the initiation of termination of parental rights proceedings. In view of respondent-mother's delay in entering into a family services agreement with DHHS and a determination that respondent-mother "ha[d] not begun to fully engage with the components," Judge Foster denied respondent-mother's

request and determined that "[i]t is in the best interest of the juveniles that termination of parental rights be pursued by the Department against the parents[.]"

On 29 January 2019, respondent-mother filed motions seeking to have her visitation rights with Daniel and Sara reinstated and to have the initiation of the termination of the parental rights proceeding stayed. In support of this motion, respondent-mother provided information concerning her progress toward satisfying the conditions of her family services agreement, which included the completion of a six-month inpatient substance abuse rehabilitation program; the completion of a sixty-day intensive outpatient substance abuse treatment program; the submission of negative drug screens on a consistent basis since 26 June 2018; her ongoing attendance in substance abuse intensive outpatient treatment; the completion of a four-hour domestic violence course; the completion of parenting classes; and the leasing of a rent-subsidized residence that was suitable for the children as of 20 November 2018. Respondent-mother asserted that she had "maintained her sobriety since April 2018" and had demonstrated overall "stability for several months" and claimed that her supervised phone calls with Sara "appear to be going well."

On 30 April 2019, before respondent-mother's motions had been heard and decided, DHHS filed a petition seeking to have the parents' parental rights in Daniel and Sara terminated. According to the allegations set out in the termination petition, respondent-mother's parental rights in the children were subject to termination on

the basis of neglect, N.C.G.S. § 7B-1111(a)(1), and willfully leaving the children in a placement outside the home for more than twelve months without making reasonable progress toward correcting the conditions that had led to the children's removal from the family home, N.C.G.S. § 7B-1111(a)(2).

¶ 12   Judge Foster held another permanency planning hearing on 2 May 2019 and, in an order entered on 22 July 2019, maintained the children's primary permanent plan of adoption. After making findings that acknowledged respondent-mother's progress toward satisfying the requirements of her family services agreement, Judge Foster determined that "[t]he conditions that [had] led to the juveniles coming into custody have not been corrected," that respondent-mother "is not in full compliance with the components [of] her service agreement," and that respondent-mother had "not made adequate progress with the components of that agreement within a reasonable period of time." Among other things, Judge Foster held that respondent-mother had not seen Daniel since "on or about February 8, 2018"; that she "is unemployed, and . . . does not have a source of income"; and that she "has significant mental health and substance abuse issues, and . . . needs to demonstrate her ability to maintain her sobriety." Although Judge Foster denied respondent-mother's motion to stay the termination of parental rights proceeding, she precluded the termination hearing from beginning prior to a permanency planning hearing scheduled for 22 August 2019. Judge Foster also granted respondent-mother an additional two-hour

visitation session with Sara each month[5] while ordering that respondent-mother's visitation with Daniel should "remain[ ] suspended until such time as visits are recommended by the juvenile's therapist."

¶ 13     On 15 May 2019, the guardian ad litem filed a motion for review in which she sought to have all contact between respondent-mother and the children suspended in response to unauthorized contact that had occurred between respondent-mother and Sara. After holding a hearing for the purpose of considering the issues raised by the guardian ad litem's motion for review on 30 May 2019, Judge Foster entered an order suspending all "visitation, phone calls or any other form of communication or contact between [respondent-mother] and the juveniles" on 27 June 2019. In her order, Judge Foster found that Sara, along with several other children, had run away from the group home in which she had been placed with several other juveniles on 12 May 2019; that the employees of the group home had filed a missing person's report and notified DHHS of Sara's unauthorized departure from her placement without permission on 13 May 2019; and that DHHS had notified respondent-mother of Sara's disappearance by e-mail before inquiring if respondent-mother had heard from Sara. Judge Foster further found that respondent-mother had responded to a social

---

[5] In spite of the fact that Judge Foster had formally authorized the resumption of respondent-mother's visitations with Sara at the 2 May 2019 permanency planning hearing, the record reflects that respondent-mother participated in supervised visits with Sara on 9 March 2019, 6 April 2019, and 4 May 2019.

worker's e-mail by stating that "she had not heard from her daughter" and that respondent-mother had remained in contact with the social worker until 5:42 p.m. on 13 May 2019, at which point respondent-mother asked the social worker to "keep [her] posted." In addition, Judge Foster found that, unbeknownst to DHHS,[6] respondent-mother "was present in North Carolina on May 13, 2019 due to a criminal court appearance in Davidson County" and that, after receiving a phone call from Sara, respondent-mother had arranged to meet Sara and the other juveniles at approximately 7:00 p.m. on 13 May 2019 for the ostensible purpose of "pick[ing] up all the children, feed[ing] them and tak[ing] them somewhere." Judge Foster found that, "[w]ithin ten to twenty minutes of the phone call," respondent-mother had arrived at the location at which she had arranged to meet Sara in a vehicle driven by her pastor, Joseph Divinsky, that was also occupied by Sara's maternal grandmother, and "physically forced [Sara] into [the] vehicle[.]" Judge Foster also found that, instead of contacting DHHS, law enforcement officers, or employees of the group home for the purpose of alerting them about the juveniles' location, respondent-mother had taken Sara to buy clothes and eat dinner before staying with Sara overnight in a Salisbury hotel. Finally, Judge Foster found that respondent-mother

---

[6] As respondent-mother pointed out at the termination hearing, the written report submitted by the guardian ad litem in advance of the 2 May 2019 permanency planning hearing stated that "[respondent-mother] currently has pending charges in Davidson County with an upcoming court date of May 13, 2019."

had only contacted DHHS for the purpose of having Sara returned to her placement after missing two phone calls from the social worker on the morning of 14 May 2019.[7] Based upon these findings, Judge Foster determined that respondent-mother had "violated the Court's prior orders by having contact with [Sara] outside of the court-ordered visitation and by having Joseph . . . in the presence of [Sara]" and suspended all visitation and other forms of contact between respondent-mother and Sara.

¶ 14        The trial court held a pre-trial hearing in the termination proceeding on 8 July 2019 and set the matter for hearing on 30 September 2019. On the afternoon of 8 July 2019, respondent-mother filed a motion in which she sought review of the children's permanent plan on the grounds that she had maintained stable housing and sobriety for more than eight months, had "renewed her cosmetology license and expect[ed] to have employment soon," and had obtained a favorable result from an ICPC home study. Judge Foster denied respondent-mother's motion for review by means of an order entered on 12 September 2019.

¶ 15        Another permanency planning hearing commenced on 22 August 2019 and concluded on 20 September 2019. In an order entered on 17 October 2019, Judge Foster found that the ICPC home study that had been ordered for respondent-

---

[7] Although the trial court found in the termination order that respondent-mother had contacted DHHS on 15 May 2019, the undisputed evidence established that respondent-mother had phoned the social worker on the morning of 14 May 2019, a fact that suggests that the trial court's reference to initial contact having been made on 15 May 2019 is nothing more than a clerical error.

mother's residence had been denied on or about 9 August 2019 and that respondent-mother remained unemployed and lacked a source of income. Judge Foster noted that respondent-mother "had previously reported that she was receiving financial assistance from [Joseph's] Everlasting Arms Ministry" and "is currently engaged to Joseph[.]" Based upon these and other findings, Judge Foster ordered DHHS to "pursue termination of parental rights against [the parents] as soon as possible."

¶ 16 The trial court held a three-day termination of parental rights hearing between 30 September 2019 and 28 October 2019 and entered an order terminating the parents' parental rights in Daniel and Sara on 6 February 2020. In its termination order, the trial court determined that respondent-mother's parental rights in the children were subject to termination on the grounds that she had willfully left them in an out-of-home placement for more than twelve months without making reasonable progress toward correcting the conditions that led to their removal from her home, N.C.G.S. § 7B-1111(a)(2),[8] and that DHHS had failed to establish that respondent-mother's parental rights in the children were subject to termination on the grounds of neglect, N.C.G.S. § 7B-1111(a)(1). After considering the statutory dispositional factors delineated in N.C.G.S. § 7B-1110(a), the trial court concluded

---

[8] The trial court determined that respondent-father's parental rights in the children were subject to termination for neglect, N.C.G.S. § 7B-1111(a)(1); willful failure to make reasonable progress toward correcting the conditions that had led to their removal from the family home, N.C.G.S. § 7B-1111(a)(2); failure to establish paternity, N.C.G.S. § 7B-1111(a)(5); and abandonment, N.C.G.S. § 7B-1111(a) (7).

that, while the termination of respondent-mother's parental rights would be in Daniel's best interests, the same would not be true with respect to Sara.[9] As a result, the trial court terminated respondent-mother's parental rights in Daniel while leaving her parental rights in Sara intact. Respondent-mother noted an appeal to this Court from the trial court's termination order.

## II. Substantive Legal Analysis

In seeking relief from the trial court's termination order before this Court, respondent-mother contends that the trial court erred by concluding that her parental rights in Daniel were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2). We believe that respondent-mother's contention has merit.

## A. Relevant Legal Principles

According to well-established North Carolina law,

> [w]e review a district court's adjudication under N.C.G.S. § 7B-1111(a) to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law. Unchallenged findings of fact are deemed supported by competent evidence and are binding on appeal. . . .
>
> The issue of whether a trial court's findings of fact support its conclusions of law is reviewed de novo. . . .

---

[9] The trial court concluded that the termination of the father's parental rights would be in both children's best interests.

*In re J.S.*, 374 N.C. 811, 814–15 (2020) (cleaned up).  As a result, the ultimate issue raised by respondent-mother's challenge to the trial court's termination order is whether the findings of fact that the trial court made in the course of determining that respondent-mother's parental rights in Daniel were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2) have adequate record support and whether the trial court's properly supported findings of fact establish that respondent-mother had willfully failed to make reasonable progress toward correcting the conditions that had resulted in Daniel's removal from the family home.

According to N.C.G.S. § 7B-1111(a)(2), a parent's parental rights in a child are subject to termination in the event that "[t]he parent has willfully left the juvenile in foster care or placement outside the home for more than 12 months without showing to the satisfaction of the court that reasonable progress under the circumstances has been made in correcting those conditions which led to the removal of the juvenile." N.C.G.S. § 7B-1111(a)(2).  "[A]n adjudication under N.C.G.S. § 7B-1111(a)(2) requires that a child be left in foster care or placement outside the home pursuant to a court order for more than a year at the time the petition to terminate parental rights is filed," *In re J.S.*, 374 N.C. at 815 (cleaned up), with the reasonableness of the parent's progress to be assessed as of the date of termination hearing.  *Id.*

As this Court has previously stated,

> a finding that a parent acted willfully . . . does not require
> a showing of fault by the parent.  A respondent's prolonged

> inability to improve her situation, despite some efforts in that direction, will support a finding of willfulness regardless of her good intentions, and will support a finding of lack of progress sufficient to warrant termination of parental rights.

*In re J.S.*, 374 N.C. at 815 (cleaned up). On the other hand, "a trial judge should refrain from finding that a parent has failed to make 'reasonable progress . . . in correcting those conditions which led to the removal of the juvenile' simply because of his or her failure to fully satisfy all elements of the case plan goals.' " *In re A.B.C.*, 374 N.C. 752, 760 (2020) (quoting *In re B.O.A.*, 372 N.C. 372, 385 (2019)). Moreover, while a parent's "compliance with a judicially adopted case plan is relevant in determining whether grounds for termination exist pursuant to N.C.G.S. § 7B-1111(a)(2)[,]" *In re B.O.A.*, 372 N.C. at 384,

> the issue of whether or not the parent is in a position to actually regain custody of the children at the time of the termination hearing is not a relevant consideration under N.C.G.S. § 7B-1111(a)(2), since there is no requirement for the respondent-parent to regain custody to avoid termination under that ground. Instead, the court must only determine whether the respondent-parent had made "reasonable progress under the circumstances in correcting those conditions which led to the removal of the juvenile." N.C.G.S. § 7B-1111(a)(2). Accordingly, the conditions which led to removal are not required to be corrected completely to avoid termination. Only reasonable progress in correcting the conditions must be shown.

*In re J.S.*, 374 N.C. at 819, 845 S.E.2d at 73 (cleaned up).

**B.    Analysis of the Trial Court's Findings of Fact**

The trial court made the following uncontested findings of fact concerning the circumstances that led to the children's placement outside the family home and the initial response that respondent-mother made to the children's placement in DHHS custody:

> 2. . . . [L]egal and physical custody of the juveniles has remained with [DHHS] continuously since July 26, 2017.
>
> 3. . . . [In a]pproximately, May 2018, [respondent-mother] left the state of North Carolina for various purposes and reasons, including seeking residential treatment placement in the state where [she] currently resides, being that it was closer to her children, who were placed at the time in the state where the mother currently resides, and removing herself from close geographic proximity to any location where she may encounter [respondent-father]. . . .
>
> . . . .
>
> 9. The conditions which led to the juveniles coming into custody include but are not limited to domestic violence between the parents, prior Child Protective Services (CPS) history in Randolph County, the mother's mental health issues, the parents' history of unstable housing, and the parents' substance abuse issues.
>
> . . . .
>
> 12. The mother has had an opportunity to correct the conditions that led to the juveniles' removal from the home, including but not limited to being offered a service agreement with the Department. [Respondent-mother] willfully delayed entering into

> a service agreement because she insisted on entering into the agreement along with [respondent-father]. Due to [respondents'] history of domestic violence, the Department would not allow a dual service agreement.

According to the trial court, respondent-mother "ultimately entered into the service agreement with the Department on January 26, 2018, and it was last updated in January 2019."

¶ 22        Next, the trial court made findings that detailed the progress that respondent-mother had made in addressing the five components of the family services agreement that she entered into with DHHS. The trial court's findings with respect to each of these issues can be summarized as follows:

### 1.        Substance abuse

¶ 23        The trial court found that respondent-mother had enrolled in a six-month residential substance abuse program on 4 May 2018, had successfully completed the program on 30 October 2018, had "enrolled herself into an intensive outpatient substance abuse program" after completing inpatient treatment, and had completed all three phases of intensive outpatient treatment by 30 April 2019. In addition, the trial court found that respondent-mother "continues to work with Baptist Health regarding her ongoing mental health treatment and therapy" and had submitted a sufficient number of consecutive negative drug screens to satisfy DHHS that the drug

screening process could be discontinued.  As a result, the trial court determined that "[respondent-mother was] in compliance with this component of her case plan."

## 2. Domestic violence

The trial court found respondent-mother had left North Carolina in early May 2018 for the purpose, at least in part, of "remov[ing] herself from close geographic proximity to any location where she may encounter [the father]."  In addition to extricating herself from her relationship with the father, the trial court found that respondent-mother had completed a four-hour domestic violence course in her current state of residence in October 2018, that she had completed "an eight-hour domestic violence class and counseling" on 5 April 2019, and that "[n]o other domestic violence courses were recommended" for respondent-mother.  As a result of her participation in this educational and treatment process and the fact that she had not been involved in any incidents of domestic violence since leaving North Carolina, the trial court found that respondent-mother was "in compliance with this portion of her case plan."

## 3. Emotional and Mental Health Needs

The trial court found that respondent-mother "is actively engaged in therapy and treatment regularly and has consistently done so from the time she left the State of North Carolina, up to and through the date of this hearing."  As a result, the trial court concluded that respondent-mother was "in compliance with this component of her case plan."

### 4. Housing, Environment, and Basic Physical Needs

¶ 26 The trial court made the following findings of fact with respect to issues relating to housing, the environment in which respondent-mother lived, and respondent-mother's ability to satisfy her basic physical needs and those of the children:

> [Respondent-mother] was ordered to obtain and maintain a suitable home for the juveniles and . . . maintain all utilities without service interruption for 6 months and pay the rent each month on time . . . .
>
> In approximately May of 2018, [respondent-mother] . . . entered into a residential treatment program for approximately six months. At the completion of the program, [she] . . . obtained housing on November 20, 2018 in her current state of residence. [Respondent-mother] provided [DHHS] Social Worker [Aricia Ross-Clayton] with a copy of her lease as proof of residence with the juveniles' names on the lease. She currently receives a stipend to help with utilities from the state [where] she resides as well as clothes, food and financial assistance from a local charity. An ICPC home study request was completed by the County Department of Human Services in the state where she is currently residing on August 27, 2019. The ICPC home study was completed and the home was appropriate with working utilities. However, the ICPC home study was denied due to [respondent-mother's] current criminal history. The local authorities were notified that [respondent-mother] was the biological parent and they denied the ICPC home study contrary to their policies for a biological parent on the basis of previous criminal history.
>
> Approximately one week after the hearing held on October 1, 2019, Social Worker Ross-Clayton received a letter from Jessica Doherty with the Department of Social Services in

> [respondent-mother's] current state of residence regarding exceptions to the ICPC home study policy in regard to biological parents. Ms. Doherty indicated that their Department would be willing to monitor the mother's home, due to her being the biological parent, despite prior CPS or criminal history.
>
> However, this error was not discovered within a sufficient period of time to be corrected without requiring the execution of a completely new ICPC Home Study, which could take several months. The juveniles have been in the custody of [DHHS] for a period in excess of two years and continuing custody for the purpose of conducting a new ICPC home study will continue to prolong the juveniles' placement with [DHHS] without permanence.
>
> . . . .
>
> . . . [Respondent-mother] is in compliance of this component of her case plan. The only caution by the Court is that [she] is not currently earning sufficient income to maintain housing independently without external assistance, but . . . there is no reason to think the home is not stable for the indefinite period in the future.

As a result of the fact that no party to this proceeding has challenged the sufficiency of the evidentiary support for these findings, they are binding upon us for purposes of appellate review. *See Koufman v. Koufman*, 330 N.C. 93, 97 (1991).

¶ 27 On the other hand, respondent-mother does challenge the sufficiency of the evidentiary support for the portion of Finding of Fact No. 20(a)(1) stating that she had "fail[ed] to provide housing currently acceptable and appropriate for the juveniles to have any possibility of being placed in her care" lacks sufficient evidentiary support. According to both the record evidence and the trial court's findings of

evidentiary fact, however, respondent-mother had leased a residence that was suitable for herself and the children and had working utilities since November 2018. As of the time of the termination hearing, respondent-mother had maintained occupancy of this residence for a period of almost one year. For that reason, the trial court expressly found that respondent-mother was "in compliance of this component of her case plan" and that "there [was] no reason to think the home is not stable for the indefinite period in the future."

¶ 28        As is reflected in its findings of fact, the trial court's concern about the stability and sufficiency of respondent-mother's housing arrangements did not stem from any deficiency in the condition of the premises that respondent-mother occupied or respondent-mother's ability to continue leasing those premises. Instead, the trial court's concern about respondent-mother's housing arrangements rested solely upon the unfavorable result of the ICPC home study. However, the unfavorable result in question rested upon an error made by the relevant agency in the state in which respondent-mother resided coupled with the trial court's unwillingness to tolerate the additional delay in achieving permanency for the children that would inevitably result from the performance of another ICPC home study. In other words, the trial court's findings indicate that the necessity for the second home study resulted from an error made by the relevant agency in the state in which respondent-mother resided rather than from respondent-mother's conduct. As a result, we conclude that the

challenged portion of Finding of Fact No. 20(a)(1) relating to respondent-mother's failure to provide acceptable housing lacks sufficient evidentiary support, so that we will disregard the relevant portion of that finding of fact in evaluating whether the trial court's findings of fact support its determination that respondent-mother's parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2).[10] *See In re S.D.*, 374 N.C. 67, 75 (2020).

### 5. Parenting Skills

The trial court found that respondent-mother was in "partial compliance" with the component of her family services agreement that was intended to address issues relating to parenting skills. The trial court found that, while respondent-mother had failed to complete the Parenting Assessment Training Education Program prior to leaving North Carolina, she had completed "a parenting class through . . . an agency in her state and county of residence . . . on October 29, 2018," "[i]n lieu of the PATE program." In addition, the trial court found that respondent-mother had completed a "Nurturing Parenting Program" on 20 February 2019. According to the trial court,

---

[10] In its brief before this Court, DHHS posits that respondent-mother might not be able to renew her subsidized lease at the expiration of her current lease term. The trial court expressly found, however, that there was "no reason to think the home is not stable" for the foreseeable future. As the Court of Appeals has correctly determined, reliance upon such speculative concerns does not suffice to demonstrate a lack of reasonable progress for purposes of N.C.G.S. § 7B-1111(a)(2). *See In re Nesbitt*, 147 N.C. App. 349, 359 (2001) ("conclud[ing] that the petitioner has failed to meet its burden of demonstrating by clear, cogent and convincing evidence the absence of reasonable progress related to housing to support termination of [the respondent-mother's] parental rights").

the parenting courses that respondent-mother had completed provided "no opportunity for the instructor to observe [her] directly interact with the [children] in order to evaluate her ability to put the skills and knowledge she learned into action in an actual parenting situation."

In addition, the trial court found that respondent-mother had obtained a "parenting psychological assessment through [a provider] located in her current state of residence" on 22 April 2019. According to the trial court, no treatment had been recommended for respondent-mother, with the assessor having reported that respondent-mother "shows no problematic concerns regarding her current parenting or past substance abuse history."

The trial court further found that respondent-mother had not visited Daniel since February 2018 and that her visitation with the children remained in a state of suspension at the time of the termination hearing. In spite of the fact that respondent-mother had been allowed to visit with the children in the aftermath of their removal from the family home, the trial court found that she had "stopped showing up to her visits and subsequently her visits with the [children] were suspended from May 3, 2018 until March 7, 2019, when her visitation with [Sara] was reinstated on a monthly basis. Although the trial court found "no evidence of concern" in connection with the supervised visits that respondent-mother had with Sara in March, April, and May 2019, those visits were suspended on 30 May 2019

"due to [her] actions in response to [Sara] running away from Nazareth Children's Home."

¶ 32    Respondent-mother argues that a portion of Finding of Fact No. 12(a) that describes her handling of the "runaway incident" during 13–14 May 2019 lacks sufficient evidentiary support. Even though respondent-mother has not disputed the sufficiency of the evidence to support the manner in which the trial court described her actions during the "runaway incident" or its finding that her "contact with [Sara] during that time violated the existing court orders that limited her to specifically scheduled and supervised visitations" and prohibited Sara from "being in the presence of [Joseph,]" respondent-mother objects to the trial court's determination that the manner in which she responded to this situation "indicates clear issues related to [respondent-mother's] parenting skills, reflecting that [she] is not in full compliance with this component of her case plan."

¶ 33    As an initial matter, we note that the trial court did not find "clear issues related to [respondent-mother's] parenting skills" based solely upon her decision to keep Sara in her custody overnight on 13–14 May 2019 instead of immediately notifying law enforcement officials, DHHS, and employees of the group home that she had located Sara and was providing care for her. Among other things, the trial court also pointed to respondent-mother's actions after the children entered DHHS custody, including "the suspension of her visitation *on two separate occasions*," as indicating

the existence of unaddressed deficiencies in respondent-mother's parenting skills. (Emphasis added). Aside from the fact that respondent-mother does not challenge the sufficiency of the evidence to support the trial court's findings concerning the initial suspension of her visitation rights at the time of the 3 May 2018 permanency planning hearing, we note that the 2 July 2018 permanency planning order reflects dissatisfaction with respondent-mother's ongoing substance abuse problems and the absence of any meaningful progress toward satisfying the requirements of her family services plan.

¶ 34        As far as the "runaway incident" is concerned, we are not unsympathetic to respondent-mother's contention that her primary concern at the time that she arranged to meet her daughter on the evening of 13 May 2019 was for Sara's physical and emotional well-being.[11] On the other hand, we are prohibited by well-established principles of North Carolina law from looking behind the trial court's determination that respondent-mother's failure to contact DHHS until the following morning reflected poor judgment on respondent-mother's part and violated prior court orders given that the trial court's evaluation of respondent-mother's conduct is reasonable and constitutes nothing more than permissible fact-finding that has adequate evidentiary support. *See generally In re D.L.W.*, 368 N.C. 835, 843 (2016) (recognizing

---

[11] As an aside, we note that the trial court did not find that respondent-mother had been in contact with Sara prior to respondent-mother's last e-mail exchange with the social worker at 5:42 p.m. on 13 May 2019.

that the trial court has the responsibility, acting in its capacity as the trier of fact, to weigh and draw reasonable inferences from the evidence).

¶ 35          Similarly, we reject respondent-mother's contention that the trial court erred by considering the "emergency decisions regarding her runaway teenage daughter" and her initial "delay in entering a case plan" after the children had been taken into DHHS custody to be relevant to the issue of whether respondent-mother's parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2). As far as the first of these two objections is concerned, it is clear to us that the making of "emergency decisions" is an inherent part of parenting and may appropriately be considered by a trial court in the course of evaluating a parent's parenting skills. In addition, we note that, instead of faulting respondent-mother for making a split-second decision under the influence of the stress of Sara's disappearance, the trial court's findings reflect a failure of judgment on the part of respondent-mother that occurred over a period of more than twelve hours, during which respondent-mother withheld information concerning Sara's locations from her lawful custodians.

¶ 36          In the same vein, we hold that a parent's delay in signing a case plan or attempting to address the conditions leading to a child's removal from the home has indisputable relevance to an evaluation of the willfulness of a parent's conduct and the reasonableness of that parent's progress in correcting the conditions that had led

to a child's removal from the family home for purposes of N.C.G.S. § 7B-1111(a)(2). *See In re I.G.C.*, 373 N.C. 201, 206 (2019) (affirming a trial court's determination that a parent's parental rights were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2) on the grounds that the trial court's findings demonstrated that "respondent-mother waited too long to begin working on her case plan and that, as a result, she had not made reasonable progress toward correcting the conditions that led to the children's removal by the time of the termination hearing"); *In re Moore*, 306 N.C. 394, 405 (1982) (affirming a trial court's determination that a parent's parental rights were subject to termination for failure to make reasonable progress where the "respondent left the children in foster care for more than four years," "did not visit or communicate with them or make any serious effort to do so" during the first three years of their time in foster care, and "made arrangements to visit the children and manifested some efforts to arrange a place for the children to live with her" only after the termination petition had been filed). Although the trial court is, of course, required to consider any progress that the parent might have made up to and including the date of the termination hearing in determining the reasonableness of his or her efforts to eliminate the conditions that had led to a child's removal from the family home, *see In re I.G.C.*, 373 N.C. at 206, it should also evaluate the reasonableness of any progress that the parent has made in light of the amount of time that the parent had been given to make that progress. *See In re J.S.*, 374 N.C.

811, 820–21 (2020) (stating that, "[i]n light of . . . the fact that respondent was afforded almost three years to achieve a home environment suitable for her children, we conclude that the trial court did not err by finding that respondent failed to make reasonable progress pursuant to N.C.G.S. § 7B-1111(a)(2) under these conditions and by finding that her failure to do so was willful").

¶ 37        Finally, we have no hesitation in rejecting respondent-mother's suggestion that the trial court was not entitled to evaluate the parenting decisions that she made relating to Sara in evaluating the reasonableness of her progress with regard to Daniel. As the trial court's findings reflect, the conditions that led to the children's removal from the family home and the requirements set out in respondent-mother's family services agreement with DHHS were not child-specific. As a result, to the extent that respondent-mother's interactions with Sara shed light upon the nature and extent of her parenting skills, evidence concerning those interactions was equally relevant to an evaluation of the progress that respondent-mother had made in correcting the conditions that had led to Daniel's removal from the family home for purposes of N.C.G.S. § 7B-1111(a)(2). *Cf. In re Allred*, 122 N.C. App. 561, 564 (1996) (concluding that the parent's prior neglect of four older children was admissible for the purpose of shedding light upon the issue of whether a different child was likely to be neglected in the event that that child was returned to the parent's care); *cf. also* N.C.G.S. § 7B-101(15) (2019) (providing that, "[i]n determining whether a juvenile is

a neglected juvenile, it is relevant whether that juvenile . . . lives in a home where another juvenile has been subjected to abuse or neglect by an adult who regularly lives in the home"). The relevance of respondent-mother's inactions with Sara is particularly obvious in this case given the absence of any interactions between respondent-mother and Daniel since February 2018. As a result, we reject respondent-mother's challenge to the relevant portion of the trial court's findings.

**C.     Reasonableness of Respondent-Mother's Progress**

In light of our determinations with respect to respondent-mother's challenges to the trial court's findings of evidentiary fact, we move to a consideration of her contention that the trial court's findings do not support its determination that she willfully failed to make reasonable progress toward correcting the conditions that had led to the children's removal from her home pursuant to N.C.G.S. § 7B-1111(a)(2). Although this Court and the Court of Appeals have previously characterized this and related grounds for termination as both an "ultimate finding" and a "conclusion" of law, we review the sufficiency of the trial court's findings to support its determination that a parent's parental rights in a child are subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2) using a de novo standard of review regardless of the manner in which the trial court's decision is ultimately characterized. *See In re A.B.C.*, 374 N.C. at 761 (holding that the "unchallenged findings of fact support the trial court's conclusion that respondent failed to make reasonable progress to correct the

conditions that led to the removal of [the juvenile] from her care" (footnote omitted));
*In re W.K.*, 376 N.C. 269, 273 (2020) (characterizing a trial court's determination of
"neglect" for purposes of N.C.G.S. § 7B-1111(a)(1) as an "ultimate finding"); *see also*
*In re Z.D.*, 258 N.C. App. 441, 449 (2018) (stating that, "[b]ecause the evidence and
findings were insufficient to support the trial court's ultimate finding that
Respondent failed to make reasonable progress, we hold the findings do not support
the conclusion that grounds existed pursuant to N.C.[G.S.] § 7B-1111(a)(2) to
terminate Respondent's parental rights"); *In re J.S.L.*, 177 N.C. App. 151, 163 (2006)
(stating that "[t]he trial court failed to make findings of fact to support a conclusion
that respondent father 'willfully left the [children] in foster care for more than 12
months without showing . . . reasonable progress under the circumstances has been
made in correcting those conditions which led to the removal of the [children]' "
(alterations in original) (quoting N.C.G.S. § 7B-1111(a)(2))).

¶ 39        In its termination order, the trial court stated that respondent-mother's
parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-
1111(a)(2) because:

> The mother has willfully left the juveniles in foster care or
> placement outside of the home for more than 12 months
> without showing to the satisfaction of the Court that
> reasonable progress under the circumstances ha[s] been
> made in correcting those conditions, which led to the
> removal of the juveniles.  This finding is not based on the
> reason that the mother cannot care for the juveniles on the
> account of poverty, but is based solely on the fact [of] the

> mother's delayed engagement in her case plan as noted in this order[;] the failure of her to provide housing currently acceptable and appropriate for the juveniles to have any possibility of being placed in her care[; t]he likelihood, that if this ground were not found, and this case continues under the current circumstances, the juveniles will simply remain in the custody of [DHHS] indefinitely with no ability to make progress towards any reunification nor adoption, and would not be able to make progress on any existing permanent plan; as well as the evidence concerning the mother's parental decision making from the runaway incident set forth in the findings of fact.

For the reasons set forth above, we will disregard the trial court's reference to respondent-mother's supposed "failure . . . to provide housing currently acceptable and appropriate for the juveniles to have any possibility of being placed in her care," *see In re S.D.*, 374 N.C. at 83, in evaluating the validity of the trial court's determination that respondent-mother's parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2).

¶ 40 According to respondent-mother, "the record and undisputed findings of fact establish that [she] made significant and reasonable progress in resolving the conditions that brought the children into DHHS custody." We are unable to dispute the validity of this argument given that the record evidence and the trial court's findings establish that respondent-mother had made consistent and sustained progress toward correcting the conditions that had led to the children's removal from the family home beginning in May 2018, when she left North Carolina and entered residential substance abuse treatment in the state in which the children were, at that

time, residing. Among other things, respondent-mother removed herself from proximity to respondent-father, an action that had the effect of significantly reducing the likelihood of continued domestic violence between the parents. By the time of the termination hearing, respondent-mother had maintained her sobriety for approximately seventeen months and had maintained housing that was suitable for herself and the children for approximately twelve months. During the same period of time, respondent-mother had availed herself of multiple opportunities to obtain education and treatment relating to her substance abuse, mental and emotional health, domestic violence, and parenting skills problems. As a result, the record evidence and the trial court's findings establish that respondent-mother had addressed each of the direct or indirect causes for the children's removal from her home. *Cf. In re K.D.C.*, 375 N.C. 784, 794–95 (2020) (reversing a trial court determination that the parent's parental rights were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2) on the grounds that the record failed to show that the parent had failed to comply with the provisions of her case plan that were intended to address her substance abuse problems and established that the parent's failure to complete parenting classes was mitigated by her completion of a "Mothering class"). As a result, after conducting the required de novo review, we hold that the trial court's findings of fact simply do not support a determination that respondent-mother had willfully left the child in foster care or a placement outside the home without showing

to the satisfaction of the court that reasonable progress under the circumstances had been made in correcting the conditions that had led to the child's removal pursuant to N.C.G.S. § 7B-1111(a)(2).

¶ 41    In urging this Court to affirm the trial court's order, the guardian ad litem emphasizes the fact that Daniel had been in DHHS custody for twenty-seven months as of the time of the termination hearing and argues that this case is similar to *In re I.G.C.*, in which, even though the parent had been given two years within which to correct the conditions that had resulted in the child's removal from the home, the bulk of her progress had been made "between the court's cessation of reunification efforts and the termination hearing."  373 N.C. at 204.  The guardian ad litem notes that, in upholding the trial court's determination that the parent's parental rights were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2) in *In re I.G.C.*, we pointed to the presence of "findings which showed that respondent-mother *waited too long* to begin working on her case plan and that, as a result, she had not made reasonable progress toward correcting the conditions that led to the children's removal by the time of the termination hearing."  *Id.* at 206 (emphasis added).

¶ 42    The facts in this case are, however, clearly distinguishable from those at issue in *In re I.G.C.*  The trial court's findings in this case show that respondent-mother began to make significant progress in May 2018 and had continued to do so up to the time of the termination hearing, making her actions quite unlike the "limited

achievements" of the parent in *I.G.C.,* who "failed to complete the recommended treatment needed to fully address the core issues of substance abuse and domestic violence which had played the largest roles in the children's removal." *In re I.G.C.*, 373 N.C. at 205. In addition, the parent in *In re I.G.C.* "failed to obtain stable housing for at least six months[,]" *id.* at 205, 835 S.E.2d at 435, and acknowledged at the termination hearing that "she would not feel comfortable having the children returned to her care for another 'year, year and a half' because she feared the possibility that she would relapse." *Id.* at 205. Simply put, this case simply does not involve last-minute, limited steps taken by a parent faced with the looming prospect of having his or her parental rights terminated of the type that existed in *I.G.C*, c*f. In re O.W.D.A.*, 375 N.C. 645, 653–54 (2020) (concluding that a parent's "eleventh-hour efforts" that resulted in "some minimal progress during his most recent incarceration" were insufficient to "outweigh the evidence of his persistent failures to make improvements while not incarcerated" for the purpose of determining the "probability of repetition of neglect" under N.C.G.S. § 7B-1111(a)(1)); "[e]xtremely limited progress" by a parent, *In re Nolen*, 117 N.C. App. 693, 700 (1995), or the "prolonged inability" of a parent "to improve her situation, despite some efforts in that direction[,]" *In re B.S.D.S.*, 163 N.C. App. 540, 546 (2004). On the contrary, the trial court's properly supported findings demonstrate the existence of sustained and

largely successful efforts by respondent-mother to satisfy the requirements of her case plan.

¶ 43    As both DHHS and the guardian ad litem point out, an analysis of the trial court's findings reflects that the sole unresolved issue that respondent-mother faced at the time of the termination hearing involved her failure to fully demonstrate sufficient improvement in her parenting skills.  Admittedly, respondent-mother had not visited Daniel since February 2018.  For that reason, respondent-mother had not been able to show, in a practical setting, that she had been able to actually achieve the positive results that one might have predicted based upon her successful completion of parenting courses in October 2018 and February 2019 and the favorable parenting assessment that she received in April 2019.  On the other hand, the record reflects that respondent-mother unsuccessfully requested the trial court to reinstate her visitation rights relating to Daniel in January 2019 in light of the substantial progress that she claimed to have made in satisfying the requirements of her family services agreement and that she lacked the ability to require the trial court to allow her to visit with Daniel.  *See In re K.L.T.*, 374 N.C. 826, 840, (2020).  Moreover, as respondent-mother notes in her reply brief, the trial court had been amenable to allowing the resumption of her visits with Daniel at the time of the 2 May 2019 permanency planning hearing in the event that Daniel's therapist viewed the prospect of such visits in a favorable light, an event that had not occurred as of 30

May 2019, when Judge Foster suspended her contact with the children in the aftermath of the "runaway incident." Finally, the record contains no indication that Daniel's therapist had any concerns about respondent-mother's progress in satisfying the requirements of her family service agreement or her parenting skills or any indication that anything untoward had occurred during respondent-mother's three supervised visits with Sara in March, April, and May 2019.

¶ 44        Although the trial court was, as we have already indicated, fully entitled to consider respondent-mother's actions during the "runaway incident" in assessing whether her parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2), her actions on that occasion must be viewed in the context of her overall success in addressing the principal causes for the children's removal from her home, including her problems with substance abuse, domestic violence, mental health, and housing instability, and her partial success in satisfying the parenting skills component of her family services agreement. *See In re K.D.C.*, 375 N.C. at 794–95. After considering the trial court's properly supported findings in their entirety, we conclude that respondent-mother's serious error of judgment at the time of the "runaway incident" is not sufficient, without more, to support the trial court's conclusion that respondent-mother had willfully failed to make reasonable progress toward correcting the conditions that had led to the children's removal from the family home. As a result, the trial court's properly supported findings of fact,

considered in their entirety, simply do not suffice to support its determination that respondent-mother's parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2).

Our decision that the trial court's termination order should be reversed is bolstered by the trial court's determination that respondent-mother's parental rights in the children were not subject to termination for neglect pursuant to N.C.G.S. § 7B-1111(a)(1) in view of DHHS' failure to prove that the children would probably experience future neglect if they were returned to respondent-mother's care. In view of the fact that respondent-mother was not required to show that her immediate reunification with the children would be appropriate in order to preclude a determination that her parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2), *see In re J.S.*, 374 N.C. at 819–20,[12] the trial court's conclusion that DHHS had failed to show a likelihood of further neglect tends to suggest that respondent-mother had, in fact, made adequate progress in correcting the conditions that had led to the children's removal from the family home. As a result, for all of these reasons, the trial court's order terminating respondent-mother's parental rights in Daniel is reversed.

_____

[12] We do not, of course, wish to be understood as holding that a parent could never be required to be able to immediately reunify with the children in order to avoid a finding that his or her parental rights in the children were not subject to termination pursuant to N.C.G.S. § 7B-1111(a)(2); we simply hold that, no such requirement could have been appropriately imposed in this case.

REVERSED.